IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES K. BREMEL,

        Plaintiff,              OPINION AND ORDER

  v.

                                   17-cv-347-wmc

TIM HAINES, et al.,

        Defendants.

---

JAMES K. BREMEL,

        Plaintiff,              OPINION AND ORDER

  v.

                                   17-cv-348-wmc

J. WATERMAN, et al.,

        Defendants.

---

In these proposed civil actions, plaintiff James K. Bremel alleges that various correctional officers, doctors, nurses and other employees of the Prairie du Chien Correctional Institution ("PDCI") and the Wisconsin Secure Program Facilty ("WSPF") violated his rights under the Eighth Amendment of the United States Constitution by (1) using excessive force and (2) showing deliberate indifference to his serious medical needs. Since Bremel is proceeding *in forma pauperis*, this court must screen the merits of his complaints and dismiss any portion that is: (1) frivolous or malicious; (2) fails to state a claim on which relief may be granted; or (3) seeks money damages from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2). As each complaint includes a common thread of allegations related to the medical care he received for a hand injury, the court will consolidate these lawsuits. *See* Fed. R. Civ. P. 42(a) (permitting consolidation of cases

involving a "common question of law or fact").  Construing Bremel's complaints together for purposes of screening, the consolidated case will be allowed to proceed under Case No. 3:17-cv-347-wmc for the reasons set forth below.

ALLEGATIONS OF FACT[1]

### I. Bremel's Hand Injury

Plaintiff James K. Bremel was incarcerated at PDCI until his transfer to WSPF on January 8, 2016.  During this time, he had a "clear and obvious" injury and deformity in his right hand, with the pinky finger missing and prominent scarring from a prior injury.  He further alleges that this health issue was disclosed to the Wisconsin Department of Corrections ("DOC") when he began his confinement, resulting in a notice detailing a permanent loss of motion in the wrist, arm and finger areas being placed in his file.

On approximately October 15, 2015, Bremel was seen by Dr. Cox, the attending physician at PDCI, who noted swelling on the palm side of Bremel's right hand, as well as limited range of motion in the middle and ring fingers and the wrist area.  Bremel was then referred to Dr. Bentz, head of plastic surgery at U.W. Hospital in Madison.  After seeing him on December 21, 2015, Dr. Bentz ordered Bremel to wear a splint and to rest and protect his hand.

### II. Cell Extraction

While Bremel complains about a January 7, 2016, cell extraction at PDCI, the

---

[1] While portions of Bremel's complaint appear to be somewhat inconsistent, or at least incomplete, the court construes his *pro se* complaint generously, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), and assumes all factual allegations to be true after construing any inconsistencies in a light most favorable to plaintiff.

events leading up to this incident are relevant to his claims. Bremel alleges that a task force had been investigating his allegations of misconduct against Sergeant Reger. Because Bremel remained in Reger's unit, he was subject to harassment, intimidation and bullying, causing him to write to Warden Tim Haines about these issues. After receiving no response, Bremel began a two-week hunger strike to create awareness of his situation. This caused Dr. Johnson to interview Bremel, who informed Dr. Johnson that he feared for his safety at PDCI due to his interactions with Reger. Shortly thereafter, Captain Krackey interviewed Bremel, who again relayed his safety concerns. Finally, Captain Skime interviewed Bremel, who again repeated his concerns and requested a transfer. Although Bremel was allegedly told that he would not be put on Reger's floor, no protective measures were taken after these interviews.

Bremel was apparently returned to segregation on January 4, 2016, shortly before the alleged excessive force incident. During this time, although not scheduled to be on duty, Bremel alleges Sergeant Reger came to his cell, commented on the excessive force investigation, and made unspecified threats. After Bremel informed Captain Torqerson about this exchange, Torqerson told him to file a complaint but that it was unsubstantiated given the lack of audio in the video. In contrast, Bremel implies the proximity in time of Reger's threats to the following events should have verified his claims to being in danger at PDCI.

Bremel was subjected to a four-person extraction team on January 7, 2016, which is identified as the "John Doe Entry Team." Bremel alleges that the team, as well as their John Doe supervising officer, did not take the time to examine Bremel's intake records

3

before entering his cell. Bremel also alleges that he was thrown to the floor, his hands were cuffed behind his back, his legs were placed in shackles, and he was then "jerked" into a standing position by his cuffed arms to be escorted to a shower by a group of corrections officers. When rounding a corner on the way to the shower, he further alleges that one of the corrections officers on Bremel's right side bent his wrist in a "severe" downward motion, causing immediate pain throughout his arm. Bremel maintains he tried to alleviate the pressure, screamed in pain, and yelled at the officer to let go of his hand, stating: "look at my hand, it's obviously injured, not normal." (Compl. (dkt. #1) 3.) The officer allegedly then said, "something about applying pressure to pressure points," but then decreased the pressure.

### III. Treatment for Injury

About 30 minutes after this incident, Bremel was examined by a nurse, who appears to be the "Jane Doe" nurse named as a defendant. By this time, his wrist was swelled and discolored, with a severely limited range of motion, leaving him unable to raise his middle or ring fingers. Bremel was then told he would be seen by a doctor the next morning, January 8, and a photo was taken. At that point, Bremel was placed in an observation cell on the authorization of an attending "white shirt" officer and the John Doe security director. Despite his request to a property sergeant for it to be sent immediately, however, the splint Dr. Bentz had ordered was not provided to Bremel. Additionally, while Bremel submitted a request to the Health Services Unit ("HSU"), staff only repeated that Bremel would see a doctor the next day, taking no action to ensure Bremel received his splint.

On approximately January 8, 2016, Bremel was transferred to WSPF without

4

explanation and immediately placed in segregation with a paper restriction. Despite the promises that he would be seen by a doctor, Bremel was neither interviewed nor seen by any HSU staff. After attracting the attention of a nurse, he eventually obtained and submitted another HSU slip. After being seen, HSU staff apparently ordered that a splint be worn. While staff at first told Bremel that he could not have the splint in segregation, it was eventually provided on or around approximately January 20, 2016.

In addition, although the timing is unclear, Bremel also was seen at a follow-up appointment at the U.W. Madison. At that point, the doctor noted a new injury to plaintiff's hand, again recommending use of the splint for an extended period of time, along with Tylenol, and further recommended surgery to repair Bremel's damaged hand. Nevertheless, plaintiff alleges that he was subsequently denied Tylenol by HSU staff, and he was forced to wait indefinitely for additional, unspecified medical treatment.

Bremel alleges that his subsequent medical care at WSPF continued to be inadequate generally during this period, but he does not include specific allegations about his care until approximately October 27, 2016. On that date, Bremel contacted HSU, complaining of swelling, soreness and loss of range of motion in his right hand and wrist related to his January injury at PDCI. Instead of being seen, however, Nurse Feldman simply relayed that he had an upcoming appointment with "the provider" and to take Ibuprofen.

Upon seeing the provider, Assistant Nurse Practioner Bonson, Bremel stated that he was under the care of Dr. Bentz at U.W. Hospital. Accordingly, Bremel asked Nurse Bonson to contact Dr. Bentz or the U.W. Hospital Director to advise the best course of

5

action, but Bonson allegedly instead ordered an ultrasound, even after Bremel renewed his request to be seen at U.W. Hospital. After the ultrasound, Bremel also contacted HSU on approximately October 30, 2016, asking to see "the provider" for pain treatment based on the ultrasound. In a November 1, 2016 response, without personal examination, Nurse Bonson responded that she ordered an MRI to investigate a "mass/cyst," as well as ice and Ibuprofen. Bremel replied on approximately November 12, 2016, stating his confusion and complaining that he was out of Ibuprofen and never received an "ice restriction." On November 14, 2016 someone named "R. Feldman" then apparently reported back to Bremel the date(s) she last saw him, what she ordered, and that she would put Bremel on the list to see the provider again.

On November 28, 2016, Bremel contacted Warden Boughton to make him aware of his situation. Bremel alleges Boughton "attempted to avoid knowledge of the situation" because Bremel's note was stamped as being received by the Warden's Office on the day it was sent. HSU Manager Waterman responded the next day that Bremel would be seen after an MRI and plastic surgery consult.

After "continuously" attempting to voice his worries about the lack of pain management care by an onsite provider and the need for a faster follow up with Dr. Bentz, Bremel received a response from nurse Edge on December 2, 2016, who instructed him to use an HSU form that she would forward to the provider. On approximately December 26, 2016, Bremel received a response to his November 23, 2016, HSU request from Feldman stating that Bremel could let them know if he needed anything.

On December 29, 2016, Bremel also received a response from Warden Boughton

stating that: (1) he had received correspondence related to Bremel's allegedly inadequate care; (2) he spoke to HSU Manager Waterman; and (3) WSPF has no control over offsite appointment scheduling, although he understood an appointment was now pending. Bremel alleges this is untrue, because if contacted, Dr. Bentz would have advised an "immediate follow up" was needed.

On approximately January 26, 2017, Bremel was transported for an appointment with Dr. Bentz. During that appointment, Dr. Bentz told Bremel that if he had been contacted, he would have scheduled an immediate follow up. Moreover, Dr. Bentz concluded that surgery was "imminent" and would likely involve removal of a tendon from Bremel's leg to repair the tissue, which could have been avoided if his health care treatment had been equivalent to "a private patient." Bremel received another memo from Boughton on approximately January 27, 2017, that contained numerous factual errors about his history of incarceration and complaints of inadequate medical care.

OPINION

Plaintiff's allegations implicate Eighth Amendment claims for the use of excessive force, failure to protect and deliberate indifference to his serious medical needs. As explained below, plaintiff has alleged sufficient facts as to his excessive force and deliberate indifference claims against some of the defendants, but has not done so with respect to his claim for failure to protect.

I. **Eighth Amendment Excessive Force**

The Eighth Amendment prohibits conditions of confinement that "involve the

7

wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Because prison officials must sometimes use force to maintain order, the central inquiry for a court faced with an excessive force claim is whether the force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). To determine if force was used appropriately, a court considers factual questions such as "the need for the application of force, the relationship between the need and the amount of force that was used and the extent of the injury inflicted." *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (internal brackets omitted).

Here, plaintiff alleges the use of force against him on January 7, 2016, was excessive and malicious because he was already separated from the general population in a segregation cell, and he was already restrained by numerous officers when his cuffed wrist and already obviously injured and deformed hand was further injured by unnecessary jerking and bending. At this early stage of the proceedings, plaintiff's allegations are sufficient to state an excessive force claim against the John Doe defendant members of the four-person entry team who extracted plaintiff from his cell, their John Doe supervising officer and the John Doe corrections officers who then escorted him to the shower. Plaintiff should be aware that success on this claim will require him to introduce evidence both identifying these defendants *and* proving that each of them personally used force maliciously and sadistically to cause him harm or failed to intervene in its use despite being in a position to do so. *See Hudson*, 503 U.S. at 6-7.

Plaintiff's allegations related to excessive force do not, however, implicate Sergeant Reger, Dr. Johnson, Captain Krackey, Captain Skime or Captain Torqerson. While

8

plaintiff alleges Reger threatened him, there is no evidence Reger was involved in the cell extraction or its planning. This is not to say that plaintiff would be incapable of stating a claim for harassment or retaliation against Reger based on his alleged threats, but the current complaint lacks sufficient detail to support such claims.[2]

Plaintiff should, therefore, immediately and aggressively pursue discovery as to the identity of the John Doe defendants and their respective conduct, as well as any role that Sergeant Reger or others may have personally played in their actions.

## II. Eighth Amendment Failure to Protect

The Eighth Amendment also requires prison officials to insure that "reasonable measures" are taken to guarantee inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). An inmate may prevail on such a claim by alleging that (1) he faced a "substantial risk of serious harm" and (2) the identified prison officials acted with "deliberate indifference" toward that risk. *Id*. at 834.

Dr. Johnson, Captain Krackey, Captain Skime and Captain Torqerson's knowledge that plaintiff feared Sergeant Reger does not connect them to the alleged use of excessive force on January 7, particularly given the absence of any evidence that incident somehow

---

[2] The Eighth Amendment prohibits "harassment unrelated to prison needs." *Courtney v. Devore*, 595 F. App'x 618, 619 (7th Cir. 2014) (citing *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)). A claim for First Amendment retaliation requires a plaintiff to (1) identify a constitutionally protected activity in which he was engaged; (2) identify one or more retaliatory actions taken by defendant that would likely deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) allege sufficient facts that would make it plausible to infer that plaintiff's protected activity was a motivating factor in defendant's decision to take retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 555-56 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

9

involved Reger. For the same reason, Warden Tim Haines will also be excused from the action, and it is at best unclear from the complaint how Lieutenant Brinkman is involved.

**III. Eighth Amendment Deliberate Indifference to Medical Needs**

In contrast, plaintiff will be granted leave to proceed against certain defendants for their deliberate indifference toward his injuries. The Eighth Amendment "establish[es] the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To state a deliberate indifference claim, a plaintiff must create an inference that his medical needs were "objectively serious" and that prison officials possessed a "deliberately indifferent" state of mind. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

"A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citing *Farmer*, 511 U.S. at 834). For the subjective component, "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (citing *Farmer*, 511 U.S. at 842). To establish indifference to serious medical needs for a denial of medical care, then, a plaintiff must demonstrate that: (1) he had a serious medical need; (2) defendants knew that plaintiff needed medical treatment; and (3) defendants consciously failed to take reasonable measures to provide the necessary treatment. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

As an initial matter, plaintiff has alleged sufficient facts for this court to infer that plaintiff's hand injury was a serious medical need. In determining which claims may go

forward, the court must evaluate whether any defendant knew plaintiff required medical treatment and consciously failed to take reasonable measures to provide that treatment. In the case of the Jane Doe nurse, who treated plaintiff after his cell extraction, there is no factual allegation to reasonably infer that providing an examination and referral to see a doctor the next day rises to the level of a conscious failure to provide necessary treatment. As to the John Doe security director, there is similarly no allegation that his placing plaintiff in an observation cell after the extraction did anything to deny plaintiff necessary treatment or that any subsequent denial resulted from that action.

In the case of the John Doe property sergeant, plaintiff has alleged sufficient facts for his deliberate indifference case to move forward. Specifically, plaintiff alleges that he requested his medical splint be transferred when he was placed in segregation, which could be enough for a jury to conclude that the property sergeant knew of a serious medical need and consciously failed to provide plaintiff with a necessary treatment as previously determined by a doctor.

Plaintiff has also sufficiently alleged that Advance Nurse Practitioner Bonson was told in detail that he was not receiving adequate treatment and, nonetheless, took no action over an extended period of time to arrange for him to be seen by a physician. While Bonson took some action by ordering an ultrasound and an additional MRI, ice and ibuprofen, a jury could conclude that she was aware such measures were an inadequate course of treatment for plaintiff's severe hand injury and that limiting his care to those measures constituted a conscious denial of necessary treatment for a serious medical condition. Of course, actually *proving* this allegation may require expert testimony.

Similarly, Bremel alleges that HSU Manager Waterman was aware of repeated complaints of inadequate treatment and did nothing to address the situation. While Waterman did respond to plaintiff that he would be seen for an MRI and plastic surgery consult after his complaint to the Warden's Office, this did not address, at minimum, his alleged need for more effective pain management treatment.

As for Nurse Edge, who told plaintiff to use an HSU form that she would forward to the provider, it is somewhat unclear from the pleadings if plaintiff is affirmatively alleging Edge told him that she would not forward his preexisting request for treatment until he used the proper form or if this was an instruction for the future. Regardless, plaintiff has alleged facts sufficient to proceed at this time, as a jury *might* reasonably infer that merely forwarding a request was an inadequate treatment response to plaintiff's requests for more appropriate pain management.

As for Nurse Feldman, plaintiff has alleged enough to create a possible inference of inadequate treatment on the basis of her November 14, 2016, response to plaintiff's apparent injuries and complaints. By merely placing him on a list to see a provider, rather than addressing his pain complaints that he was out of Ibuprofen and he never received ice that had been ordered by a doctor, there is enough reasonably to infer that Feldman permitted him to suffer needlessly, at least on the pleadings.

However, plaintiff may not proceed against Anderson, who allegedly engaged in brief correspondence with plaintiff after HSU Manager Waterman was already contacted, as well as Kramer, Lee and Bethel. While these defendants are named in the second complaint, plaintiff has not alleged that any of them knew about his condition, much less

that they ignored his needs or responded to him in a blatantly inappropriate manner.

Finally, while plaintiff claims that Warden Boughton's office did not directly respond to his first complaint, that omission does not support a finding of deliberate indifference to his medical needs. Rather, it appears from plaintiff's allegations that Boughton consulted the responsible parties and deferred to their professional opinions, which he is entitled to do. *See Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006). As such, Boughton will be dismissed.

Again, while some of plaintiff's claims are enough to pass muster under the court's lower standard for screening, he will ultimately have to prove by admissible evidence not just that he had a serious medical need, but that defendants showed actual, deliberate indifference. Indeed, "a defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation." *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). In particular, plaintiff must prove: (1) his medical conditions constituted serious medical needs, which may well require expert testimony rebutting medical evidence to the contrary; and (2) the defendants knew his condition was serious and deliberately ignored his condition and related pain. Moreover, the Eighth Amendment does not entitle plaintiff to "demand specific care" or even "the best care possible"; instead plaintiff must prove that prison officials did not pursue "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. At this juncture, however, he will at least be provided the opportunity to take discovery and martial evidence in support of his claims.

ORDER

IT IS ORDERED that:

1) These two actions are consolidated and will proceed under Case No. 17-cv-347-wmc.

2) Plaintiff James K. Bremel is GRANTED leave to proceed on an Eighth Amendment excessive force claim against the John Doe entry team defendants, their John Doe supervisor and the John Doe corrections officers involved in the alleged January 7, 2016, incident.

3) Plaintiff James K. Bremel is also GRANTED leave to proceed on an Eighth Amendment deliberate indifference to medical needs claim against the John Doe property sergeant, Bonson, Waterman, Edge and Feldman.

4) Plaintiff is DENIED leave to proceed on any other claims. With regard to both the Eighth Amendment excessive force claim and possible failure to protect claim, Sergeant Reger, Dr. Johnson, Captain Skime, Captain Torqerson, Warden Tim Haines and Lieutenant Brinkman are DISMISSED. With regard to the Eighth Amendment deliberate indifference to medical needs claim, the Jane Doe nurse, John Doe security director, Anderson, Kramer, Lee, Bethel and Boughton are DISMISSED.

5) Pursuant to an informal service agreement between the Wisconsin Department of Justice and this court, copies of plaintiff's complaint and this order are being sent today to the Attorney General for service on the defendants. Under the agreement, the Department of Justice will have 60 days from the date of the Notice of Electronic Filing in this order to answer or otherwise plead to plaintiff's complaint if it accepts service for the defendants. Summons will not issue for the Doe defendants until plaintiff learns their identities and amends his complaint accordingly.

6) For the time being, plaintiff must send the defendant a copy of every paper or document he files with the court. Once plaintiff has learned what lawyer will be representing the defendants, he should serve the lawyer directly rather than the defendant. The court will disregard any documents submitted by plaintiff unless plaintiff shows on the court's copy that he has sent a copy to the defendants or to defendants' attorney.

7) Plaintiff should keep a copy of all documents for his own files. If plaintiff does not have access to a photocopy machine, he may send out identical handwritten or typed copies of his documents.

8) If plaintiff moves while this case is pending, it is his obligation to inform the court of his new address. If he fails to do this and defendants or the court are unable to locate him, his case may be dismissed for failure to prosecute.

Entered this 23rd day of January, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge